

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00015-CR

———————————————

DEMETRICE M. GILSTRAP, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1568635D

Before Bassel and Womack, JJ.; and Lee Gabriel (Senior Justice, Retired,
Sitting by Assignment)
Memorandum Opinion by Justice Gabriel

**MEMORANDUM OPINION**

Appellant Demetrice M. Gilstrap appeals from his conviction for possession of a controlled substance, methamphetamine, of four grams or more, but less than 200 grams and from his sentence of five years' confinement in the Institutional Division of the Texas Department of Criminal Justice. *See* Tex. Health & Safety Code Ann. § 481.115(a), (d); Tex. Penal Code Ann. § 12.33(a). In a single issue, he argues that the evidence is insufficient to sustain a verdict of guilty for possession of a controlled substance because there were not sufficient links between him and the drugs found by the police. Because the evidence allowed a rational factfinder to find beyond a reasonable doubt that Gilstrap possessed the drugs, we affirm.

## I. BACKGROUND

During the late-night hours of October 31, 2018, Christopher Lovely was working as a security guard for A.P. Securities and was assigned to Motel 6 in Euless, Texas. One of Lovely's responsibilities was to enforce the posted curfew of the motel, which had been initiated because of drug activity on the premises. The curfew was in effect between the hours of 10:00 p.m. and 6:00 a.m.; it prohibited guests and others from being outside the rooms except to smoke or to make necessary trips to and from their automobiles. A sign concerning the curfew was posted for guests who checked in, and other curfew signs were located throughout the buildings.

Lovely was watching the property while parked when he observed a vehicle with three occupants pull into the parking lot on the south side of the motel. He saw

2

one of the three occupants get out of the car with a backpack. At trial, he identified that individual as Gilstrap. Lovely saw Gilstrap go into a room on the south side of the building and leave that room in three to four minutes, after which he entered another room on the same side. Upon leaving the second room, Gilstrap went through a breezeway to the other side of the property. As Lovely was about to approach the car Gilstrap got out of, it pulled out and proceeded to the other side of the motel where Gilstrap had walked. Lovely followed and was again approaching the car when he saw Gilstrap coming out of room 256 on the second level of the motel. Lovely recognized Gilstrap as a man he had seen weeks before at room 256.

Upon seeing Gilstrap leave room 256, Lovely told him that "his actions were a little suspicious and that [there was] a curfew and that he needed to leave."[1] Gilstrap "started getting aggravated" with Lovely and went back into room 256 multiple times. At one point, Gilstrap told Lovely to "wait right there" and that he had something for Lovely. Then Gilstrap again went back inside room 256.

When Gilstrap left room 256 that time, he proceeded downstairs where Lovely had remained. Lovely explained that he felt threatened as Gilstrap approached him and as a result, he called 911. He described how Gilstrap kept his hands in his waistband as he came around the car, causing Lovely to be concerned about what he

---

[1]At the time this exchange took place, Lovely was wearing a uniform that had his A.P. patch and a badge on the front, an A.P. patch on his ballistic vest, and a security placard on his back.

might be hiding. Lovely testified that was "when [he] drew [his] pistol from the holster and kept it at low ready when [he] still had 911 on the phone call."[2] When Gilstrap first saw Lovely's gun, he went behind the car for a matter of seconds and then went back upstairs and into room 256. Lovely followed Gilstrap upstairs and remained on the phone with 911 until the police arrived about three minutes later.

Officer Josh Bennett, a nineteen-year veteran of the Euless Police Department, was the primary officer investigating this call. Bennett testified that he had previously conducted numerous investigations at that motel including death investigations, shootings, robberies, burglaries, prostitution, and crimes involving narcotics. Bennett was dispatched to that location at 11:08 p.m. Upon arriving, Bennett joined his backup officer, who had arrived first, and observed Lovely and Gilstrap in a verbal argument in the parking lot. Bennett was wearing a body cam which captured the events of that night. The officers learned that Gilstrap had multiple warrants for his arrest, and he was placed into custody at that time.

While in the parking lot, Bennett asked Gilstrap specifically whether he had "a room here or [was] just visiting?" Gilstrap immediately responded, "I have a room." The officer then inquired whether "[Gilstrap had] belongings in that room." Gilstrap then changed his previous answer and responded, "Well, I don't, well, I don't have a

---

[2]Lovely related his qualifications for the security job he performed and detailed his training to become a personal protection officer, commissioned security officer, and private investigator. At the time of these events, he was a licensed security officer and certified to carry a weapon.

room . . . . I like, I mean, my friend has a room[.]" After his arrest, the officers searched Gilstrap and recovered $1,789 in assorted bills. He was then transported to jail.

Acting upon a drug complaint made by Lovely concerning room 256, Bennett and his backup officer went to follow up with the other resident of that room. Again, Bennett's body cam recorded everything that occurred while the officers were at the door and in the room. When the officers knocked, the door was answered by a female who identified herself as Rachel Denison and as a friend of Gilstrap.[3] Denison told the officers that she had been staying in the room for about three months. She allowed the officers to enter the room, and when the officers requested permission to search the room, she responded,"I mean, is there, do I have a choice? I mean I don't have a problem with it. I don't have anything in here, so . . . ." She remained in the room for over thirty minutes while the search occurred and never withdrew her consent.

Officer Bennett generally described the room as "personalized. What I mean by personalized is hats hung up on the wall. . . . They were there for [an] extended amount of time. . . . [L]ots of clothes, lots of food and beverages." Bennett found five to ten pieces of mail addressed to Gilstrap, at an address other than the motel, in different locations in the room. Mail addressed to Denison was also found in the

---

[3]The extent of Gilstrap's relationship with Denison was never fully explained, but Denison agreed with Bennett when he characterized it as "friends with benefits."

room. Bennett further found drug paraphernalia in multiple locations in the room. These items included scoop spoons for measuring, digital scales, a glass methamphetamine smoking pipe, and a marijuana grinder.

Early in the process of the search, Bennett found methamphetamine and live rounds of ammunition in Denison's purse.[4] He also found a Smith & Wesson revolver in a blue tennis shoe located on the bottom dresser shelf. While searching the closet in the motel room, Bennett found a black duffle bag. Inside the duffle bag, Bennett found men's clothing, two scales, and methamphetamine.[5] In addition, the officer found a credit card issued to Gilstrap as well as a receipt from Foot Action with his name on it among the items in the duffle bag.

Gilstrap was indicted for possession with intent to deliver a controlled substance of four grams or more but less than 200 grams. *See* Tex. Health & Safety Code Ann. § 481.112(a), (d). The jury found him guilty of the lesser-included offense of possession of a controlled substance of four grams or more, but less than 200 grams. *See id.* § 481.115(a), (d). After a punishment trial, the court assessed Gilstrap's punishment at five years' confinement in the Institutional Division of the Texas Department of Criminal Justice. Gilstrap brought this appeal.

---

[4]At the conclusion of the search, Denison was arrested by the officers.

[5]It is undisputed that the substance found in the duffle bag is methamphetamine.

6

## II.    DISCUSSION

In his sole issue, Gilstrap challenges the sufficiency of the evidence to establish that he intentionally or knowingly possessed the controlled substance found by the police in the duffle bag located in the closet in room 256.  Specifically, Gilstrap contends that the evidence is insufficient to affirmatively link him to the methamphetamine.

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged.  *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV.  In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt.  *Jackson*, 443 U.S. at 316, 99 S. Ct. at 2787; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).  This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman,* 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility.  *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman,* 520 S.W.3d at 622.  We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622.  Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light

most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App, 2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Id.* at 448–49. The standard of review is the same for direct- and circumstantial-evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

A person commits possession of a controlled substance, as charged in this case, if that "person knowingly or intentionally possesses a controlled substance listed in penalty Group 1," and the offense is "a felony of the second degree if the amount of the controlled substance possessed is . . . four grams or more but less than 200 grams." Tex. Health & Safety Code Ann. § 481.115(a), (d); *see also id.* § 481.102(6) (identifying methamphetamine as a penalty group one controlled substance).

Both the Texas Health and Safety Code and the Texas Penal Code provide the same definition for "possession": "actual care, custody, control or management." *Id.* § 481.002(38); Tex. Penal Code Ann. § 1.07(a)(39). Thus, "[t]o prove unlawful possession of a controlled substance, the State must prove that: (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband." *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005), *overruled in part on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 & n.32 (Tex. Crim. App. 2015). Gilstrap only challenges only the first prong.

The facts surrounding the search of the motel room are clear—Gilstrap was not present in room 256 when the methamphetamine in the duffle bag was found but Denison was. When, as here, the accused is not in exclusive possession of the place where the controlled substance is found, additional independent facts and circumstances must "link" the accused to the contraband "in such a way that it can be concluded that the accused had knowledge of the contraband and exercised control over it." *Roberson v. State*, 80 S.W.3d 730, 735 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *McKeever v. State*, No. 02-14-00466-CR, 2015 WL 1967308, at *3 (Tex. App.—Fort Worth Apr. 30, 2015, no pet.) (mem. op., not designated for publication).

The factfinder may infer that the accused intentionally or knowingly possessed contraband if there are sufficient independent facts and circumstances justifying such an inference, even if the contraband was not in the accused's exclusive possession. *Tate v. State*, 500 S.W.3d 410, 413–14 (Tex. Crim. App. 2016); *see also* Tex. Penal Code Ann. § 6.03(a) ("A person acts intentionally, or with intent, with respect to the nature of his conduct . . . when it is his conscious objective or desire to engage in the conduct . . . ."), § 6.03(b) ("A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist."). Relevant facts that may affirmatively link an accused to contraband include:

> (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether the defendant was under the

influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Evans v. State*, 202 S.W.3d 158, 162 n.12 (Tex. Crim. App. 2006).

It is undisputed by the State that some of the *Evans* factors are not present in this case. The State is not required to prove all possible affirmative links or even present evidence on each factor, and the absence of factors is not evidence of innocence that must be weighed against the factors present. *Espino-Cruz v. State*, 586 S.W.3d 538 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd); *see Wiley v. State*, 388 S.W.3d 807, 814 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). The number of factors present is not as important as the "logical force" each factor bears in linking the accused to the drugs. *Espino-Cruz*, 586 S.W.3d at 544; *Hurtado v. State,* 881 S.W.2d 738, 743 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). Gilstrap argues there are insufficient links to connect him to the methamphetamine found in the duffle bag. We disagree.

Lovely observed Gilstrap enter a motel room that evening, remain for a matter of moments, and after leaving, repeat that scenario at another room. When searched upon arrest, Gilstrap had a large amount of cash in his pocket. Lovely recognized

10

Gilstrap from having seen him at room 256 on a date previous to October 31, 2018. He saw Gilstrap repeatedly enter room 256 on the night of October 31. When Gilstrap became aggravated with Lovely, he told Lovely to stay where he was because he had something for him. Gilstrap then retreated back into room 256. When asked if he had a room at the motel, Gilstrap's first answer was that he did. Only after he was questioned about his belongings in the room did he backtrack on that answer. Upon searching the room, Bennett found men's clothing and multiple letters addressed to Gilstrap.[6] The bag that contained the methamphetamine also contained drug paraphernalia as well as men's clothing and a credit card and purchase receipt with Gilstrap's name on each.

The jury could have rationally concluded beyond a reasonable doubt that Gilstrap possessed the methamphetamine from the duffle bag based on applicable *Evans* factors including his presence at the scene, his activities that night, and the accessibility of the drugs in the closet of the room he repeatedly entered. *See Evans*,

---

[6]Gilstrap points out that the mail addressed to him was not admitted into evidence and that the only opportunity to view that mail was contained in the body-cam video taken during the search. He seems to suggest that the failure to introduce the actual mail supports his argument that there is insufficient evidence to link him to the drugs in the duffle bag. Bennett testified about finding the mail, and one piece of mail addressed to Gilstrap was shown on the body-cam video of the search. Because we will not second-guess the jury's assessment of the credibility of the witness and because we defer to the jury's resolution of any conflicting inferences, Gilstrap's argument that the failure to introduce the mail as exhibits plays no part in our review of the sufficiency of the evidence. *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016).

202 S.W.3d at 162 ("Mere presence at the location where drugs are found is thus insufficient, by itself, to establish actual care, custody, or control of those drugs. However, presence or proximity, when combined with other evidence, either direct or circumstantial [], may well be sufficient to establish that element beyond a reasonable doubt."). Gilstrap first admitted he had a room at the motel but quickly reversed course when asked about what belongings he had in the room. Considered in the context of Lovely's repeatedly observing Gilstrap enter and leave room 256 on October 31, 2018, and having seen Gilstrap at the room previously, this admission was incriminating on a relevant matter. *See Gallegos v. State*, 776 S.W.2d 312, 314 (Tex. App.—Houston [1st Dist.] 1989, no pet.) (holding defendant's incriminating statements made at the time of arrest affirmatively linked the defendant and the controlled substance). Gilstrap then displayed a consciousness of guilt by disowning that statement and distancing himself from room 256. *See Gilbert v. State*, 874 S.W.2d 290, 298 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (holding the accused's conduct which indicated a consciousness of guilt was an affirmative link between the accused and the controlled substance). In addition, the drugs were in the same bag as male clothing and the identifying credit card and receipt bearing Gilstrap's name. *See Boone v. State*, No. 02-13-00302-CR, 2014 WL 982354, at *3 (Tex. App.—Fort Worth Mar. 13, 2014, no pet.) (mem. op., not designated for publication) (holding heroin found in dresser drawer along with social security card and other personal papers was sufficient to link accused to the drugs); *Goodall v. State*, 774 S.W.2d 821, 822 (Tex.

12

App.—Fort Worth 1989, pet. ref'd) (holding cocaine found in a satchel containing the defendant's checkbook and utility bill sufficient to support the defendant's control and management of the drugs). Gilstrap also possessed a large amount of cash when arrested. *See Evans,* 202 S.W.3d at 162 n.12, 163–65 (considering a large amount of cash as an affirmative link); *Classe v. State*, 840 S.W.2d 10, 12 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (concluding that a large amount of cash discovered on the defendant was an affirmative link between the defendant and the contraband).

Based on the combined and cumulative force of all the above-described evidence and any reasonable inference therefrom, the jury was rationally justified in finding Gilstrap guilty beyond a reasonable doubt of possession of a controlled substance of four grams or more but less than 200 grams. We overrule Gilstrap's sole issue.

### III.   CONCLUSION

Having overruled Gilstrap's sole issue, we affirm the trial court's judgment.

/s/ Lee Gabriel
Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  May 27, 2021

13