In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00407-CR**
_____

**DARRELL LEE BELKEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 260th District Court**
**Orange County, Texas**
**Trial Cause No. D220312-R**

**MEMORANDUM OPINION**

A grand jury indicted Appellant Darrell Lee Belken for possession of a controlled substance, namely methamphetamine, in an amount of four grams or more but less than 200 grams. *See* Tex. Health & Safety Code Ann. § 481.115(d). The State alleged two previous felony convictions as enhancements. Belken pleaded "not guilty," but a jury found him guilty as charged in the indictment. After a hearing on punishment, Belken pleaded "not true" to the alleged enhancements, but the jury found the two alleged enhancements true and assessed punishment at 25 years of

1

confinement. At the conclusion of the punishment phase, the trial court read the jury's punishment verdict in open court with Belken present, but it did not orally pronounce the sentence. On appeal, Belken challenges his conviction in ten issues.

In Belken's last two issues he challenges the trial court's failure to orally pronounce his sentence. We previously issued a memorandum opinion and order that addressed Belken's last two appellate issues, and we abated this appeal and remanded the matter for the trial court to make its oral pronouncement.[1] The trial court orally pronounced the sentence in Belken's presence on January 8, 2025. Belken's appeal is now reinstated, and in this memorandum opinion, we address Belken's remaining eight issues, which challenge the sufficiency of the evidence, the admission of certain evidence, and exclusion of other evidence. As explained below, we affirm.

## Evidence at Trial

### Testimony of Trooper Robert Wilson

Robert Wilson testified that he is a Trooper with the Texas Department of Public Safety ("DPS") where he had worked for about nine and a half years. Wilson recalled that he was on duty at 11:00 a.m. on January 5, 2021, in South Vidor in Orange County. Wilson testified that he saw a vehicle driving that appeared to have

---

[1] *See Belken v. State*, No. 09-23-00407-CR (Tex. App.—Beaumont Dec. 13, 2024) (mem. op. and order), available at https://search.txcourts.gov/Case.aspx?cn=09-23-00407-CR.

a brake light that was out, and after verifying that the light was out, he made a traffic stop. According to Wilson, the vehicle pulled into the driveway of an abandoned house, and as soon as Wilson stopped behind the vehicle, "the passenger immediately fled [] the vehicle [] into a wooded area." Wilson testified that he was not able to identify the fleeing passenger at that time nor did he attempt to charge the passenger with anything.

Wilson testified that he then approached the driver's side of the vehicle to speak with the driver, who identified himself as Darrell Lee Belken, he verified Belken's identity using the computer in his patrol vehicle, and he identified the defendant as Belken. According to Wilson, he asked Belken why the passenger fled, and Belken told the Trooper that he did not know and that he had just met the passenger when Belken stopped for gasoline. Wilson testified that, when he looked inside the vehicle, he could see a plastic bag in plain view on the passenger side, and inside the plastic bag were "a bunch of individual little small [] clear plastic baggies." Based on his training and experience, Wilson was concerned because little plastic baggies are commonly used for narcotics. Wilson testified that he asked for consent to search the vehicle, and Belken agreed and told him that the red backpack in the vehicle was his and that a black backpack in the vehicle belonged to the passenger. Wilson waited for another Trooper, Luke Smith, to arrive before searching the vehicle.

3

According to Wilson, he found the black backpack in the back seat. Wilson testified that both the black and red backpacks contained clothes. He also testified that Trooper Smith found a black bag under the passenger seat that contained a glass pipe, a digital scale, and a clear plastic baggie with a white crystal substance inside, and Trooper Smith put those items on the hood of the vehicle. Based on his experience, Wilson thought the white crystal substance was methamphetamine, and he testified that people normally use a digital scale to weigh a substance they intend to distribute to others. He also testified that when he finds a controlled substance in a vehicle, it is normally under or between car seats or in consoles. Wilson testified that, based on the scale, bags, pipe, and methamphetamine, he concluded "they were dealing the meth and [] weighing it and selling it to people." Wilson used the digital scale to weigh the white substance, which Wilson recalled was about the size of a golf ball, and he testified that it was significantly more than he typically finds in arrests for possession of methamphetamine. According to Wilson, the methamphetamine was not found in the backpack that Belken said belonged to the passenger. Wilson agreed that at the time he arrested Belken, Wilson had probable cause to believe that Belken was intentionally and knowingly possessing methamphetamines, and if the passenger had not run away, Wilson would have arrested him, too.

Wilson agreed that both he and Trooper Smith were wearing body cameras that day and his patrol vehicle had a dash camera. Wilson identified State's Exhibits 3 and 4 as video from his dash camera and body camera recorded at the time he stopped Belken, and the exhibits were admitted into evidence and published to the jury. Wilson testified that State's Exhibit 3 depicts his stop of the bright blue sedan driven by Belken, and it shows a brake light that was out and a passenger fleeing from the vehicle. According to Wilson, Exhibit 4 shows Troopers Wilson and Smith searching the vehicle, the two backpacks, the black bag that contained contraband, and also the arrest of Belken.

Wilson testified that when he took Belken to jail, he put the contraband in the top drawer in the back of his patrol vehicle, and when he left the jail, he put the contraband in a lockbox at the DPS office in Orange. He also testified that he mailed the methamphetamine to the Houston Crime Lab for analysis, and he packaged the pipe and scale separately and shipped them to the Houston Crime Lab for destruction. According to Wilson, DPS does not have enough space to keep drug paraphernalia for a long time. Wilson testified that the Houston Crime Lab kept the methamphetamine until it was time for trial. Wilson identified a package admitted as Exhibit 5 as the methamphetamine he found in the vehicle.

Wilson recalled that Belken told him he did not know the passenger's name, "but [Belken] asked [the passenger] if he was dirty or clean without asking for his

5

name." Wilson testified that when he was searching Belken's vehicle, he found a cell phone in the passenger seat, and the phone started ringing during the search. At the time, he recognized the name that showed on the phone while it was ringing as someone who had been involved in burglaries in the area. Wilson recalled that he left the phone in the vehicle. Wilson testified that it was common for people involved with narcotics to have more than one cell phone, such as a "burner phone" to use for transactions. According to Wilson, Belken was cooperative but seemed "a little nervous" and did not maintain eye contact.

On cross-examination, Wilson testified that he did not test the scale and pipe for fingerprints because DPS does not typically do so for a possession charge. Wilson also testified that he did not investigate the individual whose name appeared on the phone that rang while he was searching the car, and he did not recall seeing Christopher Lambert's name on the phone, although the name sounded familiar to Wilson. According to Wilson, DPS does not "seize cell phones on possession charges like this…." And, DPS does not typically take fingerprints from cell phones or drug paraphernalia for possession charges. Wilson testified that he was not surprised to learn that Christopher Lambert was in prison at the time of trial for drug possession and Lambert was arrested a few months after Wilson arrested Belken. Wilson further testified that he could not identify the passenger who ran away from a name that appeared on the cell phone in the vehicle. However, Wilson testified that

6

he believed both occupants of the vehicle knew that methamphetamine or narcotics were in the vehicle. According to Wilson, he found "a whole bunch of little baggies right in plain view[,]" and if the passenger had gotten into the vehicle with them "Mr. Belken would have seen him coming to the vehicle with a bag of baggies, a backpack, and the other bag." Wilson agreed he told Belken that because he was driving the vehicle, he had possession of everything in that vehicle. On cross-examination, Wilson agreed there were other elements required to prove possession.

Testimony of Trooper Luke Smith

Luke Smith testified that he was a Trooper with DPS where he had worked for about seven years. Smith recalled that he was working on the morning of January 5, 2021, near Vidor in Orange County, and he received a call from Trooper Wilson to help with a traffic stop. Smith identified the defendant as the driver of the vehicle involved in the traffic stop, and Trooper Wilson told him that another person fled from the scene. Trooper Smith testified that he and Wilson did not look for the person who fled the scene.

Smith recalled that while he searched Belken's vehicle, Trooper Wilson searched the two backpacks that were in the vehicle, and Smith ultimately found a black cloth bag underneath the front passenger's seat. Smith testified that inside the bag he found a scale, a glass pipe, and a plastic baggie containing a white crystalized substance that he believed based on his training and experience was

7

methamphetamine. According to Smith, a glass pipe is typically used for smoking methamphetamine, and the scale is typically used to measure certain amounts. Smith also testified that there was another large Ziploc bag containing smaller bags, which are used in "measuring out from a larger amount of methamphetamine to a smaller amount that's being sold to other individuals." Trooper Smith identified State's Exhibit 6 as video from his body camera from the day of the traffic stop, and it was admitted into evidence and published to the jury.

Smith testified that based on talking with Belken, Smith concluded that Belken had picked up his passenger at a nearby Citgo gas station, and Smith identified State's Exhibit 7 as video obtained from the gas station. Exhibit 7 was admitted into evidence and published to the jury. When the video was played in court, Smith testified that it looked like there were two occupants in the bright blue sedan when it pulled into the gasoline station.

On cross-examination, Smith testified that after watching the video from the Citgo station, he did not see Belken fill up his car. Smith also testified that he did not see the cell phone that rang during the search of Belken's vehicle. Trooper Smith testified that when he stops people for suspected possession of drugs, he does not ask for, go through, nor seize their phones. Smith testified that, during the traffic stop and search of Belken's vehicle, he did not hear Belken ask the Troopers to fingerprint the contraband the Troopers found in the car. When asked why he thought

8

Belken acted nervous, Smith replied that Belken avoided eye contact and hung his head low when the officers were talking to him.

Testimony of Kadi Forrest

Kadi Forrest testified that she is a forensic scientist for the Houston Crime Lab and the DPS, where she has worked since May of 2022. Forrest identified State's Exhibit 5 as a package containing evidence she received in this case which contains the case number, her initials, and the date she initialed it. She testified that she always initials and dates evidence when she reseals it and secures it with evidence tape. Forrest testified that when the DPS lab gets backlogged, the lab sends evidence to NMS Labs for testing, and she recalled that when she received the package from NMS Labs, the package also had NMS stickers. According to Forrest, in this case, she was asked to test the substance because the case was going to trial and DPS did not want to pay for someone from NMS to come testify. She agreed she personally analyzed the substance contained in State's Exhibit 5a—the contents of the plastic bag. According to Forrest, after she finishes testing evidence, she repackages it, initials and dates it, and puts it in the vault for long-term storage.

Forrest explained that she conducted two color tests on the substance, and both tests were positive for methamphetamine. She then conducted a Fourier Transform Infrared Spectroscopy test and a gas chromatography/mass spectrometry test, and both of those tests also showed methamphetamine. Forrest testified that

9

what she found was consistent with what NMS Labs had reported, and she found the net weight of the evidence was 43.75 grams, which was also consistent with NMS testing. Forrest identified State's Exhibit 8 as a copy of her report and her findings. She agreed that the substance she tested weighed about 43.75 grams and was methamphetamine, as reflected in her report.

On cross-examination, she agreed that the DPS lab first received the evidence on January 7, 2021, and it was sent to NMS Labs on July 2, 2021. Forrest did not know who handled or tested the evidence at NMS Labs nor did she see the evidence before it went to NMS because it was sent to NMS before she started working for DPS.

After the close of the State's case, the defense moved for an instructed verdict, which the trial court denied. The defense also offered four exhibits—certified copies of previous judgments against Christopher Lambert, three of which were for possession of a controlled substance. The State objected and argued that the exhibits were not relevant and there was no evidence that Christopher Lambert was the passenger who fled the vehicle. The trial court sustained the State's objection. After closing arguments, the jury returned a guilty verdict against Belken. During the punishment phase, the State alleged two prior felony convictions for enhancement purposes, and Belken denied the allegations. After hearing evidence on punishment,

the jury found the two alleged enhancements true and assessed punishment at 25 years of confinement. Belken timely appealed.

Issues

Appellant raises ten issues on appeal. In his first issue, Appellant argues that the evidence is not sufficient to support his conviction "because there was no evidence to support a conclusion that appellant was in possession of the methamphetamine as alleged in the indictment." Appellant also asserts there was no evidence that he knew the contraband was in his vehicle and that the Troopers' belief that Appellant knowingly possessed methamphetamine was based on conjecture and a flawed understanding of the law.

Appellant's second, third, and fourth issues argue that the trial court erred in admitting certain evidence because the proper chain of custody was not established. The evidence Appellant challenges in these issues includes an envelope containing a bag with the contraband (issue two, State's Exhibit 5), a baggie containing the methamphetamine (issue three, State's Exhibit 5A), and the lab report on the methamphetamine (issue four, State's Exhibit 8). Appellant alleges "there was a break in the chain of custody that indicated the items had been disturbed or tampered with, without adequate explanation." Appellant argues that the witness through whom these items were offered could not account for how the evidence was handled by NMS Labs nor could she verify that the material sent to NMS Labs was the same

11

material she received back from NMS and that she then tested. Belken also contends that because NMS Labs described the substance they tested as "off-white solid material" and the DPS analyst described it as "crystalline substance[,]" there was evidence that NMS and DPS did not test the same substance. According to Appellant, "but for the erroneously admitted evidence, appellant would have been acquitted and would be a free man today."

Appellant's fifth, sixth, seventh, and eighth issues complain about the trial court excluding certain evidence—namely four certified copies of judgments for convictions of Christopher Lambert. Appellant's brief describes these documents as "criminal convictions of Christopher Lambert, the person who fled from the scene." Appellant also contends that the cell phone found in the vehicle "belonged to one Christopher Lambert[]"and that Trooper Wilson recognized Lambert when the cell phone rang, and Lambert's name appeared on the phone. According to Appellant, evidence of Lambert's criminal history of illicit drug activity was relevant to prove that Lambert "[w]as the guilty party to the exclusion of appellant" and that "appellant simply unknowingly picked up a drug trafficker who was in possession of contraband[.]"

Appellant's ninth and tenth issues allege that the trial court failed to pronounce his sentence in Appellant's presence, which deprives this Court of jurisdiction. We previously addressed these issues by order dated December 13, 2024. *See Belken v.*

12

*State*, No. 09-23-00407-CR (Tex. App.—Beaumont Dec. 13, 2024) (mem. op. and order), available at https://search.txcourts.gov/Case.aspx?cn=09-23-00407-CR. We abated the appeal and remanded the case to the trial court for pronouncement. We received a supplemental reporter's record that reflects that the trial court pronounced the sentence in Belken's presence on January 8, 2025. Therefore, we need not address issues nine and ten herein. *See* Tex. R. App. P. 47.1; *see also Chacon v. State*, 745 S.W.2d 377, 378 (Tex. Crim. App. 1988) (an issue becomes moot when it ceases to rest on any existing fact or right); *Brant v. State*, Nos. 09-15-00519-CR & 09-15-00520-CR, 2016 Tex. App. LEXIS 12269, at **1-2 (Tex. App.—Beaumont Nov. 16, 2016, no pet.) (mem. op., not designated for publication) (an issue is moot when there is no actual controversy between the parties).

Sufficiency of the Evidence

When an appellant challenges the sufficiency of the evidence supporting a conviction in a criminal case, appellate courts consider all the evidence in a light most favorable to the verdict and decide, after reviewing the evidence in that light, whether a rational trier of fact could have found the appellant guilty of the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We apply "only one standard" to evaluate whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt and that is "legal

13

sufficiency." *Temple*, 390 S.W.3d at 360; *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). In reviewing a sufficiency challenge, we defer to the jury's findings and its conclusions, as it was the jury's responsibility to fairly resolve all conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to resolve whether the defendant is guilty of the criminal offense that is at issue at trial. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 808-09 (Tex. Crim. App. 2015) (citing *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13); *Hooper*, 214 S.W.3d at 13 ("Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.") (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

The jury, as the judge of the facts and credibility of the evidence, may choose to believe or not believe the testimony of the witnesses, or any portion of their testimony, despite any contradictory evidence. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (citing *Esquivel v. State*, 506 S.W.2d 613 (Tex. Crim. App. 1974)). "'When the record supports conflicting inferences, we presume that the jury

14

resolved the conflicts in favor of the verdict, and we defer to that determination.'" *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016) (quoting *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014)). A jury is allowed to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *Temple*, 390 S.W.3d at 360.

A person commits the offense of possession of a controlled substance if he knowingly or intentionally possesses the controlled substance in the prescribed amount, by aggregate weight, including adulterants or dilutants. *See* Tex. Health & Safety Code Ann. §§ 481.102, 481.115. To prove possession, the State must prove that (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband. *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006). The State does not have to prove that the defendant had sole or exclusive possession of the drugs. *See Cude v. State*, 716 S.W.2d 46, 47 (Tex. Crim. App. 1986). However, when the defendant does not have exclusive possession of the place where the contraband is found, then independent facts and circumstances must link him to the drugs. *Poindexter v. State*, 153 S.W.3d 402, 405-13 (Tex. Crim. App. 2005) (citing *Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981)). Regardless of whether the evidence is direct or circumstantial, it must establish that the defendant's connection with the drug was more than fortuitous. *Evans*, 202 S.W.3d at 161. This is called the "affirmative links"

15

rule. *Id.* This Court has recognized the following non-exclusive factors as tending to establish affirmative links: (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the contraband; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *See Cogar v. State*, No. 09-19-00342-CR, 2020 Tex. App. LEXIS 7831, at \*\*8-9 (Tex. App.—Beaumont Sept. 30, 2020, no pet.) (mem. op., not designated for publication); *Dixon v. State*, 918 S.W.2d 678, 681 (Tex. App.—Beaumont 1996, no pet.); *see also Black v. State*, 411 S.W.3d 25, 29 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The number of factors is not as important as the logical force they collectively create to prove that a crime has been committed. *Evans*, 202 S.W.3d at 162; *Robinson v. State*, 174 S.W.3d 320, 325-26 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (citing *Roberson v. State*,

16

80 S.W.3d 730, 735 (Tex. App.—Houston [1st Dist] 2002, pet. ref'd)). The State is not required to present evidence on each factor to show a link between the defendant and the controlled substance, and the absence of a factor is not evidence of innocence that must be weighed against the factors that are present. *See Espino-Cruz v. State*, 586 S.W.3d 538, 544 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd); *see also Hernandez v. State*, 538 S.W.2d 127, 131 (Tex. Crim. App. 1976) ("[T]he absence of the above facts and circumstances is not evidence of appellant's innocence to be weighed against evidence tending to connect appellant to the marihuana.").

"Mere presence at the location where drugs are found is thus insufficient, by itself, to establish actual care, custody, or control of those drugs." *Evans*, 202 S.W.3d at 162. However, presence or proximity, when combined with other evidence, either direct or circumstantial, can be sufficient to establish that element beyond a reasonable doubt. *Id.* Convenient access to the contraband is an accepted factor. *See Robinson*, 174 S.W.3d at 326. "Conveniently accessible" means that the contraband must be within the close vicinity of the accused and easily accessible so as to suggest that the accused had knowledge of the contraband and exercised control over it. *See id.* (citing *Deshong*, 625 S.W.2d at 329; *Rhyne v. State*, 620 S.W.2d 599, 601 (Tex. Crim. App. 1981)); *see also Gregory v. State*, 159 S.W.3d 254, 260 (Tex. App.— Beaumont 2005, pet. ref'd).

The jury charge in this case included an instruction on the law of parties.[2] Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *See* Tex. Penal Code Ann. § 7.01(a). "'Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement.'" *Salinas v. State*, 163 S.W.3d 734, 739 (Tex. Crim. App. 2005) (quoting *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994)). Culpability under the law of parties does not distinguish between principals or accomplices. *See* Tex. Penal Code Ann. § 7.01(c); *Mosley v. State*, No. 09-22-00374-CR, 2024 Tex. App. LEXIS 8144, at *24 (Tex. App.—Beaumont Nov. 6, 2024, no pet.) (mem. op., not designated for publication). Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Salinas*, 163 S.W.3d at 739-40. "Circumstantial evidence alone may be used to prove that a person is a party to an offense." *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006).

Video evidence depicts Appellant's vehicle at a gas station timestamped at about 10:35 a.m., and the video shows someone seated in the passenger seat with a

---

[2] The defense did not object to the jury charge at trial.

18

drink cup. Trooper Wilson testified that it was about 11:00 a.m. when he stopped Belken for a broken brake light. Exhibits 3 and 4 show that Belken was driving the vehicle, and he stopped his vehicle and turned in the driveway of an abandoned house, and Belken told Trooper Wilson that he pulled in there because his passenger told him to. The dash camera video from Trooper Wilson's patrol vehicle shows that when the Trooper pulled in after Belken, the passenger fled into the woods, taking a drink cup with him but not anything else. Trooper Wilson testified that Belken told him that he had a red backpack in his vehicle and the black backpack that was in his vehicle belonged to the passenger, whom he did not know. Trooper Wilson found the black backpack in the back seat. Trooper Wilson testified that a plastic bag filled with smaller plastic baggies was lying in plain view inside Belken's vehicle, and Wilson testified that, based on his training and experience, little plastic baggies are commonly used for narcotics. Trooper Smith testified that he found a black cloth bag under the passenger seat that contained a scale, a glass pipe, and a plastic baggie holding a white substance that Smith believed was methamphetamine.

In this case, the jury could have considered the following affirmative links to conclude that Belken possessed the methamphetamine found in his vehicle: Belken was present when a search of the vehicle was conducted; the baggies commonly used for narcotics were in plain view; methamphetamines and related paraphernalia were found in the vehicle under the front passenger's seat; and the Troopers thought

19

Belken looked nervous and avoided giving eye contact. *See Cogar*, 2020 Tex. App. LEXIS 7831, at **8-9; *Dixon*, 918 S.W.2d at 681. Trooper Wilson testified that the methamphetamine found in Belken's vehicle was not found in the black backpack that Belken said belonged to the passenger. Further, the jury charge in this case included an instruction on the law of parties, to which the defense did not object. Trooper Wilson testified that Belken's passenger fled when the Trooper pulled in behind Belken. The video from Trooper Wilson's dash camera depicts the passenger running into the woods with his drink cup. Video from the gas station taken about 30 minutes before Trooper Wilson stopped Belken shows a passenger in Belken's vehicle with a drink cup. The jury could have regarded the passenger's flight as reflecting consciousness of guilt. *See Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994); *Manuel v. State*, No. 09-23-00215-CR, 2024 Tex. App. LEXIS 5214, at *21 (Tex. App.—Beaumont July 24, 2024, no pet.) (mem. op., not designated for publication). The jury could have disbelieved Belken's statement to the Troopers that he did not know his passenger. *See Sharp*, 707 S.W.2d at 614.

The jury, as the sole judge of the weight and credibility of the evidence, is entitled to draw multiple reasonable inferences from the evidence. *See Temple*, 390 S.W.3d at 360; *Sharp*, 707 S.W.2d at 614. Deferring to the jury as factfinder and viewing the evidence in a light most favorable to the verdict, we conclude that the jury could have determined that the cumulative force of all the incriminating

20

circumstances was sufficient to support the conviction of Belken under the law of parties for possession of a controlled substance. *See* Tex. Health & Safety Code Ann. § 481.115; Tex. Penal Code Ann. § 7.01; *Temple*, 390 S.W.3d at 360; *Hooper*, 214 S.W.3d at 13; *Evans*, 202 S.W.3d at 161; *Salinas*, 163 S.W.3d at 739. We overrule Appellant's first issue.

## Admission of Evidence

We review a trial court's ruling on the admission of evidence under an abuse of discretion standard of review. *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005). If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

Circumstantial evidence may be sufficient to prove the chain-of-custody. *See Williams v. State*, No. 09-17-00495-CR, 2019 Tex. App. LEXIS 578, at *10 (Tex.

App.—Beaumont Jan. 30, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Cain v. State*, 501 S.W.3d 172, 175 (Tex. App.—Texarkana 2016, no pet.); *Watson v. State*, 421 S.W.3d 186, 190 (Tex. App.—San Antonio 2013, pet. ref'd)). "Without evidence of tampering, most questions concerning care and custody of a substance go to the weight attached, not the admissibility, of the evidence." *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997); *see also Williams*, 2019 Tex. App. LEXIS 578, at *10 (citing *Martinez v. State*, 186 S.W.3d 59, 62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *Gallegos v. State*, 776 S.W.2d 312, 315 (Tex. App.—Houston [1st Dist.] 1989, no pet.)). When the State shows the beginning and the end of a chain of custody, any intermediate gaps go to the weight rather than the admissibility of the evidence, particularly if the chain of custody ends at a laboratory. *See id.*; *Lee v. State*, No. 09-13-00354-CR, 2015 Tex. App. LEXIS 2034, at *2 (Tex. App.—Beaumont Mar. 4, 2015, no pet.) (mem. op., not designated for publication); *Martinez*, 186 S.W.3d at 62; *Gallegos*, 776 S.W.2d at 315-16. Only upon a showing that an exhibit was tampered with or altered will a chain of custody question affect admissibility. *Wortham v. State*, 903 S.W.2d 897, 900 (Tex. App.—Beaumont 1995, pet. ref'd) (citing *Blackmon v. State*, 830 S.W.2d 711, 713 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd)); *Belton v. State*, No. 09-98-455 CR, 1999 Tex. App. LEXIS 9333, at *8 (Tex. App.—Beaumont Dec. 15, 1999, no pet.) (mem. op., not designated for publication).

Appellant challenges the admission into evidence of Exhibit 5, the envelope in which Trooper Wilson placed the methamphetamine or substance seized from Belken's vehicle, the methamphetamine itself (Exhibit 5a), and the lab analysis report on the methamphetamine (Exhibit 8). Trooper Wilson testified that after he took Belken to jail, he put the methamphetamine in a DPS lockbox and then packaged it and mailed it to the Houston Crime Lab for analysis. At trial when he was shown Exhibit 5, Trooper Wilson recognized it as the packaged evidence that was returned to him for trial by the lab, and he agreed it was sealed and not tampered with in any way. Wilson identified the package by the evidence tape with his initials on it, and he testified the exhibit contained the "exact same substance that was discovered in Mr. Belken's vehicle[.]"

Kadi Forrest, a forensic scientist for the Houston Crime Lab, identified State's Exhibit 5 as a package containing the evidence she received in this case, which included the case number, her initials, and the date she initialed it. She also testified that the package had been sent to NMS Labs for analysis due to a backlog at the Houston Crime Lab, and she identified NMS Labs stickers on the package when she received it back from the lab. Forrest testified that she personally analyzed the substance using two color tests, a Fourier Transform Infrared Spectroscopy test, and a gas chromatography/mass spectrometry test, and all tests showed that the substance was methamphetamine and that her test results were consistent with what NMS Labs

23

had reported. Forrest agreed that DPS sent the evidence to NMS Labs on July 2, 2021, but she did not know who handled or tested the evidence at NMS Labs because she was not employed by DPS at that time. She testified that the evidence weighed 43.75 grams when she tested it, and her findings were consistent with NMS Labs' findings before they sent it back to DPS.

When the defense objected to the admission of the drug evidence, the trial court overruled the objection and stated, "[a]ny alleged break in the chain of custody will go to [the] weight of the evidence and not the admissibility." There was no evidence that the evidence had been tampered with or altered in any way. We conclude that the trial court did not err in finding the evidence was admissible and that any issues concerning care or custody affected only the weight to be given to the evidence by the jury. *See Lagrone*, 942 S.W.2d at 617; *Wortham*, 903 S.W.2d at 900. The evidence shows that each party that had possession of the evidence in this case placed their identifying mark on it, and two witnesses identified the substance at trial. *See Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989), *cert. denied*, 498 U.S. 951 (1990). The Court of Criminal Appeals has explained that when the officer who seized the controlled substance identifies the substance and testifies that he seized and initialed the substance and placed the substance into and retrieved the evidence from the property room, such evidence is sufficient to prove chain of custody. *See Lagrone*, 942 S.W.2d at 617 (citing *Stoker*, 788 S.W.2d at 10). In the

absence of evidence that the substance was tampered with, there is no reason to exclude the evidence from admission just because it was stored for an extended time and had undergone prior forensic testing. *See id.* (citing *Alvarez v. State*, 857 S.W.2d 143, 147 (Tex. App.—Corpus Christi 1993, pet. ref'd)). Appellant's contention that the DPS and NMS described the substance using different words is evidence of tampering lacks factual or legal support. *See* Tex. R. App. P. 38.1(i). The trial court did not abuse its discretion in overruling Appellant's objection to the admission of State's Exhibits 5, 5a, and 8 based on an alleged failure to "conclusively establish the chain of custody." We overrule Appellant's second, third, and fourth issues.

### Exclusion of Evidence

Appellant's fifth, sixth, seventh, and eighth issues concern the trial court's ruling excluding copies of certified judgments of Christopher Lambert. We review a trial court's ruling to exclude evidence for an abuse of discretion. *See Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006); *Welch v. State*, 990 S.W.2d 876, 878 (Tex. App.—Beaumont 1999, no pet.). We will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). The party offering the evidence bears the burden to prove it is admissible. *Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim. App. 2008). "Finding a piece of evidence to be relevant is the first step in a trial court judge's determination of whether the evidence should be admitted

before the jury." *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016). Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *See id.* Although the Rules of Evidence favor the admission of relevant evidence, the trial court makes the threshold decision whether the proffered evidence is relevant, and we will not disturb that decision unless it is clearly wrong. *See id.*

When the defense tendered these particular exhibits, the State objected that the judgments for Christopher Lambert were not relevant and stated

> Mr. Lambert is not on trial here. There's been no evidence presented that he was, in fact, the runner. Only the defense is stating he was a runner. When they asked the trooper about him, he said, yeah, he's heard of that name before; but he clearly said he couldn't identify the person that ran.

Trooper Wilson testified that Belken told him he did not know the name of the passenger who fled. Wilson also testified that he did not recall seeing Christopher Lambert's name on the cell phone that was found in Belken's vehicle, although the name sounded familiar. Wilson further testified that he could not identify the man who fled from Belken's vehicle, and he had no way of knowing whether the name on the cell phone was the name of the passenger who had fled.

On this record, we conclude that the trial court did not abuse its discretion in excluding the judgments for Christopher Lambert. *See Shuffield*, 189 S.W.3d at 793;

*Welch*, 990 S.W.2d at 878. The defense failed to meet its burden to show that evidence of Lambert's prior convictions made any fact of consequence more or less probable. *See Henley*, 493 S.W.3d at 83. Neither Trooper testified that the passenger who fled was Christopher Lambert nor that the cell phone belonged to Christopher Lambert. The trial court's ruling was within the zone of reasonable disagreement, and we overrule Appellant's fifth, sixth, seventh, and eighth issues.

Having overruled all of Appellant's issues, we affirm the trial court's judgment of conviction.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on February 3, 2025
Opinion Delivered February 12, 2025
Do Not Publish

Before Johnson, Wright and Chambers, JJ.